Caroline Bush **EMENY** et al.

v.

The **UNITED STATES.**

No. 317–66.

United States Court of Claims.

July 16, 1969.

David W. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa; Floyd L. France, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on November 22, 1968. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, it is concluded that the right to use the Bush Dome for the storage of helium-gas mixtures and pure helium produced elsewhere is vested in the plaintiffs and not in the defendant. The case is remanded to the commissioner for the conduct of further proceedings consistent with this determination.

### OPINION OF COMMISSIONER

WHITE, Commissioner:

The plaintiffs (11 individuals and a bank) allege that the defendant under the power of eminent domain, has taken a subterranean geological structure, known as the Bush Dome, within lands owned by the several plaintiffs and is using such property for the underground storage of helium-gas mixtures and pure helium produced elsewhere. Accordingly, the plaintiffs assert that they are entitled to just compensation under the provision of the Fifth Amendment to the

Gaynor Kendall, Austin, Tex., for plaintiffs; Warren S. Ege, Washington, D. C., attorney of record, Joe A. Osborn, Austin, Tex., of counsel.

Constitution which declares that private property shall not be taken for public use without just compensation.

The defendant, on the other hand, contends that it has the right to store "foreign" or "extraneous" helium-gas mixtures and pure helium in the Bush Dome by reason of gas rights which it acquired in the particular lands [1] many years ago from the plaintiffs' predecessors in interest either by purchase or by condemnation, and for which compensation was paid at the time of acquisition.

At the request of the parties, the initial submission to the court involves only the question of whether the right to store in the Bush Dome helium-gas mixtures and pure helium produced elsewhere is vested in the defendant or in the plaintiffs.

It is my opinion that the right to use the Bush Dome for the storage of helium-gas mixtures and pure helium produced elsewhere is not vested in the defendant, as claimd by it, but is vested in the plaintiffs.

*Introduction*

The Bush Dome is situated within a 12,000-acre area of land in Potter County, Texas. It is a closed geological structure, or underground dome, in which gaseous substances can be stored. The pertinent storage area consists of a subterranean porous and permeable stratum of rock. The porosity and permeability of this stratum are sufficient to permit the injection of helium-gas mixtures and helium into, and the withdrawal of such materials from, the formation at the required rates of flow. The potential storage area is surrounded by impermeable rock and edge water, which prevent the escape of gaseous substances contained in the formation. The potential storage capacity of the Bush Dome is in excess of 52 billion standard cubic feet of gas.

The various tracts of land comprising the 12,000-acre area which contains the Bush Dome are owned in fee simple by the several plaintiffs, except for the gas rights held by the defendant (and certain oil rights that are not involved in the present litigation).

In its natural state, the Bush Dome was a reservoir that contained a valuable deposit of natural gas. This gas was contained in a formation known as the Panhandle Lime formation. Engineers of the U.S. Bureau of Mines have estimated that the amount of recoverable gas in the Panhandle Lime formation within the Bush Dome, before any production, was about 295 billion cubic feet.

As of 1923, the various tracts of land comprising the area which contains the Bush Dome were severally owned by Lee Bivins, William H. Bush, and the Fuqua Land & Cattle Company, predecessors in interest of the present plaintiffs. In 1923, Messrs. Bivins and Bush, and the Fuqua Land & Cattle Company severally granted to the Producers & Refiners Corporation oil and gas leases covering a total of approximately 217,000 acres of land, including the area which contains the Bush Dome. These oil and gas leases were assigned in 1924 by the Producers & Refiners Corporation to the Mountain States Gas Company; and subsequently, in the same year, the Mountain States Gas Company assigned the leases to the Amarillo Oil Company.

In 1924, wells were drilled by the Amarillo Oil Company on the leased acreage, and gas was discovered in the Panhandle Lime formation within the Bush Dome, at a depth of about 3,500 feet below the surface. The gas produced from the Panhandle Lime formation in the Bush Dome contains helium. The helium content of the gas has ranged from about 1.7 percent to about 1.9 percent.

During the period between 1924 and 1929, the Amarillo Oil Company produced approximately 4.5 billion standard cubic feet of natural gas from the Bush Dome.

In 1929, the Amarillo Oil Company transferred a number of oil and gas leases, including some leases on lands

---

1. The defendant has gas rights in all the lands that are involved in this action, and it also has oil rights in a 60-acre parcel of such land.

that are involved in the present litigation, to the Canadian River Gas Company.

On May 16, 1929, the defendant acquired by purchase the gas leasehold rights held by the Amarillo Oil Company and the Canadian River Gas Company in the lands containing the Bush Dome.

During the period 1930-1931, the defendant acquired by purchase from William H. Bush and the Fuqua Land & Cattle Company whatever gas rights they had retained under the 1923 oil and gas leases covering lands owned by Mr. Bush and the Fuqua Land & Cattle Company within the area containing the Bush Dome.

In 1933, by means of a condemnation suit, the present defendant acquired from the estate and devisees of Lee Bivins, who had died in the meantime, whatever gas rights Mr. Bivins had retained under the 1923 oil and gas leases on lands owned by him within the area containing the Bush Dome. Just compensation, as determined by the court, was paid by the present defendant for the rights condemned.

Beginning in 1929, the defendant has produced gas in substantial amounts from the Bush Dome. During the period between May 16, 1929 and the end of the fiscal year 1966, the defendant's production of native gas from the Bush Dome totaled approximately 59.7 billion cubic feet of gas. The gas has been processed for helium extraction at the defendant's plant in Amarillo, Texas, and the residue gas has then been sold by the defendant for use as fuel or for other purposes.

Pursuant to the authorization contained in the Helium Act Amendments of 1960 (74 Stat. 918; 50 U.S.C. § 167 *et seq.*) for a long-range program of conserving and storing helium for future use, the defendant instituted and put into effect what is known as the helium conservation program. As part of this program, the defendant entered into long-term contracts with four private companies for the sale by the companies and purchase by the defendant of helium-gas mixtures. Three of these companies operate three separate helium-extraction plants in Kansas, and the fourth company operates two such plants in Texas. Deliveries of helium-gas mixtures to the defendant from two of the plants were begun in December 1962; deliveries from a third plant were begun in April 1963; deliveries from a fourth plant were begun in June 1963; and deliveries from the fifth plant were begun in July 1963.

Also, as part of its helium conservation program, the defendant constructed in 1962, and now owns and operates a pipeline which connects the five plants mentioned in the preceding paragraph— and also three helium-extraction plants owned and operated by the defendant in Kansas, Oklahoma, and Texas—with the Bush Dome.

Each of the five privately owned helium-extraction plants delivers into the defendant's pipeline, at the plant gate, a helium-gas mixture, sometimes referred to as crude helium, which is required by contract to contain at least 50 percent helium. The balance of the mixture consists largely of nitrogen, but it also contains small amounts of other constituents of natural gas. Also, a helium-gas mixture is delivered into the defendant's pipeline from the defendant's plant located in Kansas; and sometimes pure helium is delivered into the defendant's pipeline from its plants located in Oklahoma and Texas. The helium-gas mixtures and pure helium from the sources mentioned are transported in the defendant's pipeline to the Bush Dome in Texas, and are injected by the defendant into that geological structure through injection wells. Such materials are then stored by the defendant in the Bush Dome until they are needed.

Furthermore, as part of its helium conservation program, the defendant in 1966 and 1967 entered into contracts with the National Helium Corporation and with Cities Service Helex, Inc., both of which are private corporations, under which the defendant has, for compensation, received and stored in the Bush Dome helium-gas mixtures belonging to the two companies.

The defendant's actions since 1962 in injecting and storing in the Bush Dome helium-gas mixtures and pure helium produced elsewhere—including helium-gas mixtures owned by third persons and stored by the defendant for compensation—occasioned the present litigation. As indicated earlier, it is my opinion that such actions by the defendant have been beyond the scope of the gas rights which the defendant acquired many years ago by purchase or condemnation in the lands containing the Bush Dome.

### Gas Leasehold Rights

In connection with the problem before the court, it is necessary that consideration be given to the defendant's gas leasehold rights in the lands containing the Bush Dome.

■ As stated in the preceding part of this opinion, the defendant in 1929 obtained by purchase from the Amarillo Oil Company and the Canadian River Gas Company the gas leasehold rights which these companies, as assignees, held at the time under the 1923 oil and gas leases granted by the then owners of the lands containing the Bush Dome to the Producers & Refiners Corporation. Each of the 1923 oil and gas leases stated that it was granted " * * * for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, power stations and structures thereon, to produce, save and take care of said products * * *."

The language of the several 1923 oil and gas leases, as quoted in the preceding paragraph, is clear and unambiguous with respect to the rights granted. Those rights pertained only to "mining and operating for oil and gas" on the leased premises and taking the other steps necessary "to produce, save and take care of said products," i. e., the oil and gas produced from the leased premises. There is no reasonable basis on which the rights granted to the lessee in the 1923 oil and gas leases could be construed as including the right to bring to the premises and store there gas produc-

ed elsewhere. As the current holder, by assignment, of gas rights under the 1923 leases, the defendant stands in the shoes of the original lessee and has only those gas rights that were granted to the original lessee.

■ In granting the 1923 oil and gas leases, the respective landowners divested themselves of—and granted to the lessee—the right to explore for, produce, possess, use, and dispose of the gas and oil in place (Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 292 (1923)), and this necessarily included the right to make reasonable use of the premises for such purposes (Guffey v. Stroud, 16 S.W.2d 527, 528, 64 A.L.R. 730 (Tex.1929); Gulf Production Co. v. Continental Oil Co., 139 Tex. 183, 132 S.W.2d 553, 562 (1939)). The lessee—and its subsequent assignees, including the defendant—did not, however, acquire any right to use the premises for any purpose other than the specified mineral exploration and production. Stephens County v. Mid-Kansas Oil & Gas Co., *supra*, 254 S.W. at page 295.

■ The surface of the leased lands and everything in such lands, except the oil and gas deposits covered by the leases, were still the property of the respective landowners. Gulf Production Co. v. Continental Oil Co., *supra*, 132 S.W.2d at page 561. This included the geological structures beneath the surface, including any such structure that might be suitable for the underground storage of "foreign" or "extraneous" gas produced elsewhere.

It necessarily follows that the 1923 oil and gas leases on the lands containing the Bush Dome did not grant to the lessee—or to the defendant as the present holder of gas rights under such leases—any right to use the Bush Dome for the storage of gas produced elsewhere.

■ In connection with this aspect of the case, it should be mentioned that one of the 1923 oil and gas leases issued by Lee Bivins contained a provision where-

in the lessee agreed to construct a pipeline for the transportation of gas from wells on the land covered by this particular lease to Amarillo, Texas, and, in consideration of the construction of such pipeline, Mr. Bivins granted to the lessee "an exclusive easement for right of way for pipe line purposes for the transportation of gas over the lands herein leased * * *." The defendant contends that in so far as this lease is concerned, the granting to the lessee of an exclusive easement for the construction of a pipeline on the land necessarily precluded the lessor (or his successors in interest) from bringing gas produced elsewhere to the leased land for underground storage purposes, because this could be accomplished only by means of a pipeline.

Since gas is a volatile substance, it actually is not necessary to bring "foreign" or "extraneous" gas to a particular tract of land by means of a pipeline, and inject the gas into the Bush Dome through the surface of that tract, in order to utilize the portion of the Bush Dome underlying such tract for the storage of gas. Gas injected into the Bush Dome through the surface of one tract of land can utilize the storage capacity of portions of the dome underlying other tracts. Thus, the granting by Lee Bivins under one lease of an exclusive easement on the leased land for a gas pipeline to transport the gas produced from the leased land to Amarillo was unrelated to the problem of the subsequent use of any underground storage capacity in the land that might become available for the storage of gas produced elsewhere. The plaintiffs do not claim here any right to construct a pipeline on the particular land.

### Purchase of Retained Gas Rights

When Lee Bivins, William H. Bush, and the Fuqua Land & Cattle Company granted the 1923 oil and gas leases on the lands involved in this litigation, the respective landowners retained certain rights with respect to the gas deposits underlying their lands, i. e., the right to require the development of such deposits by the lessee, the right to receive royalties on the gas produced from such lands, and the right to lease the lands again for gas development if the 1923 leases should terminate. With respect to the matter of royalties, the Bush and Fuqua leases provided that the respective lessors would receive one-eighth of the gas produced from their lands, while the Bivins leases provided that the lessor would receive a royalty of 1 cent per M c.f. on the gas produced from Mr. Bivins' lands.

■ During the period 1930–1931, the defendant acquired by purchase from William H. Bush and the Fuqua Land & Cattle Company all the gas rights which these respective landowners had retained at the time of the execution of the 1923 oil and gas leases. The instruments of conveyance granted to the defendant "all gas in or under, or which may hereafter be found in or under and produced from the lands," together with "all * * * rights and privileges necessary, incidental, customary or convenient to the development and exploitation of said lands for said gas * * *."

The language of the instruments of conveyance, indicating that they related to "gas * * * produced from the lands" and to "the development and exploitation of said lands for said gas," shows clearly that Mr. Bush and the Fuqua Land & Cattle Company were conveying to the defendant all those rights— and only those rights—which the respective grantors had retained in the native gas deposits underlying their respective lands. There is nothing in the language of the instruments to suggest that the parties were dealing with the right to use any underground capacity in the lands for the storage of gas produced elsewhere.

### Condemnation of Retained Gas Rights

In 1933, the defendant prosecuted a suit and obtained a judgment against the estate and devisees of Lee Bivins, who had died in the meantime, for the con-

demnation of gas rights in lands covered by the oil and gas leases which Mr. Bivins granted in 1923.

 The judgment in the condemnation suit recited that the respondents were the owners and holders of the legal title "to all the retained gas royalty rights, and other gas rights and interest in * * * [the lands described in the pleadings], outside of whatever gas rights or interests the lessee and its assigns hold therein under and by virtue of the aforesaid oil and gas leases * * * "; and decreed that "The title to the possession and enjoyment of the hereinbefore described gas rights and interests * * * shall vest and will hereby vest in the United States of America * * *."

Thus, it is clear from the language of the judgment that it related to retained gas rights in the particular lands, and not to underground storage capacity in such lands.

As previously stated, when Lee Bivins issued oil and gas leases on his lands in 1923, he retained certain rights in the gas deposits underlying his lands, i. e., the right to require the development by the lessee of the native gas deposits, the right to receive a royalty on the gas produced from the lands, and the right to lease the lands again for gas development if the 1923 leases should terminate. Therefore, the 1933 judgment transferred to the defendant all the gas rights which Mr. Bivins had retained in the native gas deposits underlying his lands.

The 1933 judgment did not, either expressly or by implication, deal with the subject of the underground storage capacity in the lands involved in that litigation.

### Conclusion

For the reasons stated, it is my opinion that the right to use the Bush Dome for the storage of helium-gas mixtures and pure helium produced elsewhere is vested in the plaintiffs, and not in the defendant.